UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:   16-20091-CR-WILLIAMS(s)
18 U.S.C. § 371
8 U.S.C. § 1324(a)(2)(B)(ii)
18 U.S.C. § 2
18 U.S.C. § 982(a)(6)

UNITED STATES OF AMERICA

vs.

BARTOLO HERNANDEZ,
JULIO ESTRADA, and
AMIN LATOUFF,

                    Defendants.
_____ Sealed

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

1.      Global Sports Management, LLC ("GSM") was a Florida corporation located at 721 Tanglewood Circle, Weston, Florida, in Broward County, in the Southern District of Florida.

2.      The defendant, **BARTOLO HERNANDEZ**, was a resident of Broward County, 721 Tanglewood Circle, Weston, Florida. **HERNANDEZ** was the manager of GSM.

3.      Total Baseball Representation & Training, Inc. ("Total Baseball Representation") was a Florida corporation located at 1102 SW 149th Path, Miami, Florida, in Miami-Dade County, in the Southern District of Florida.

4.      The defendant, **JULIO ESTRADA**, was a resident of Miami-Dade County at 1102 SW 149th Path, Miami, Florida. **ESTRADA** was the registered agent of Total Baseball Representation.

5.      The defendant, **AMIN LATOUFF**, was a resident of the Republic of Haiti, in Port-au-Prince, Haiti.

6.      The United States Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"), was a department within the executive branch of the United States government responsible for enforcing the Cuban Assets Control Regulations ("CACR"), which were promulgated by the Department of the Treasury under the Trading with the Enemy Act, Title 50, United States Code Appendix, Sections 1-6, 7-39, and 41-44.

7.      CACR generally prohibited persons subject to the jurisdiction of the United States from dealing with property in which Cuba or a Cuban national otherwise had an interest.  OFAC, however, was authorized to issue specific licenses which permitted transactions that would otherwise have been prohibited.  Under CACR, Cuban nationals seeking to enter into contracts with persons subject to the jurisdiction of the United States could submit an application and other documents to OFAC seeking a specific license authorizing those Cuban nationals to enter into these contracts.

8.      The Immigration and Nationality Act ("INA") governed the immigration laws of the United States.  Pursuant to INA, non-citizens of the United States ("aliens") were not permitted to enter and reside in the United States unless they were lawful permanent residents or obtained visas.

9.      To apply for non-immigrant visas, aliens were required, unless certain exceptions applied, to submit a DS-160 application to the United States Department of State, Bureau of Consular Affairs, an agency of the executive branch of the United States government.  The DS-160 form required applicants to answer all questions truthfully.

10.     The Department of Justice was an agency of the executive branch of the Government of the United States, and the Federal Bureau of Investigation was a component of the Department of Justice.

11.     The Department of Homeland Security was an agency of the executive branch of the Government of the United States.

**COUNT 1**
**Conspiracy to Commit an Offense Against United States**
**(18 U.S.C. § 371)**

1.     Paragraphs 1 through 11 of the General Allegations section of this Superseding Indictment are realleged as if fully set forth below.

2.     From in or around April 2009, and continuing up to the date of the return of this Superseding Indictment, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**BARTOLO HERNANDEZ,**
**JULIO ESTRADA, and**
**AMIN LATOUFF,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and Eliezer Lazo, Joel Martinez Hernandez, Diana Tilbert, and others known and unknown to the Grand Jury, to commit an offense against the United States, that is:

a.   to knowingly and willfully make a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001(a)(2);

b.   to knowingly and willfully make and use a false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001(a)(3);

c.   to knowingly use, possess, and obtain any visa and other document proscribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, knowing it to have been procured by means of fraud and unlawfully obtained, in violation of Title 18, United States Code, Section 1546(a); and

d.   to knowingly bring and attempt to bring an alien to the United States for purpose of commercial advantage and private financial gain, knowing and in reckless disregard of the fact that such alien had not received prior official authorization to come to, enter, and reside in the United States, regardless of any official action which might later be taken with respect to such alien, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii).

## PURPOSE OF THE CONSPIRACY

3.      It was the purpose of conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by assisting Cuban baseball players and those players' family members in entering into the United States illegally by (1) obtaining OFAC licenses through the submission of false and fraudulent documents, (2) obtaining visas to enter and be employed in the United States knowing those visas were procured by means of fraud, and (3) bringing aliens across the United States border without visas.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose and objects of the conspiracy included, among others, the following:

4.      **BARTOLO HERNANDEZ, JULIO ESTRADA,** and **AMIN LATOUFF** recruited and paid boat captains to smuggle Cuban baseball players and those players' family members out of Cuba to Mexico, the Dominican Republic and Haiti.

5.      **BARTOLO HERNANDEZ** directed individuals to falsify documents to conceal payment to boat captains who smuggled Cuban baseball players and those players' family members out of Cuba.

6.      After the Cuban baseball players and those players' family members were smuggled out of Cuba, **BARTOLO HERNANDEZ, JULIO ESTRADA** and others signed agreements with the Cuban baseball players that entitled **HERNANDEZ, ESTRADA** and other conspirators to a percentage of any earnings that the Cuban baseball players received from Major League Baseball teams.

7.      **BARTOLO HERNANDEZ, JULIO ESTRADA, AMIN LATOUFF**, and their co-conspirators obtained false and fraudulent foreign residency documents on behalf of the Cuban baseball players.

8.      To obtain specific licenses on behalf of the Cuban baseball players that would enable them to enter into contracts with Major League Baseball teams, **BARTOLO HERNANDEZ** submitted and caused to be submitted to OFAC the false and fraudulent foreign residency documents, knowing that those foreign residency documents contained false information about the supposed employment of Cuban baseball players.

5

9.      After falsely and fraudulently obtaining specific licenses from OFAC on behalf of the Cuban baseball players, **BARTOLO HERNANDEZ** negotiated lucrative contracts between the Cuban baseball players and Major League Baseball teams.  **HERNANDEZ, JULIO ESTRADA** and other conspirators received a percentage of the earnings that the Cuban baseball players received from Major League Baseball teams, pursuant to the agreements that **HERNANDEZ, ESTRADA** and other conspirators had previously entered into with the Cuban baseball players.

10.      After the Cuban baseball players signed lucrative contracts with Major League Baseball teams, **BARTOLO HERNANDEZ** and **JULIO ESTRADA** submitted and caused the submission of visa applications to the Bureau of Consular Affairs within the United States Department of State to obtain visas on behalf of Cuban baseball players.

11.      In some instances, **BARTOLO HERNANDEZ, JULIO ESTRADA,** and **AMIN LATOUFF** brought or attempted to bring Cuban baseball players and those players' family members into the United States without United States visas, including through fraudulent passports and United States visas in false names and through illegal border crossings.

12.      **BARTOLO HERNANDEZ** and **JULIO ESTRADA** retained and distributed the money that they received from the Cuban baseball players for their personal benefit and the benefit of their co-conspirators and others.

13.      **BARTOLO HERNANDEZ, JULIO ESTRADA** and **AMIN LATOUFF** coached individuals to offer false accounts to United States law enforcement about the manner in which Cuban baseball players and their family members were brought out of Cuba and into the United States.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the purpose thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

### Cuban Baseball Player D.S.L.

1.      In or around early April 2009, **BARTOLO HERNANDEZ** flew to Mexico to meet with the head of an alien smuggling ring.

2.      In or around early April 2009, **BARTOLO HERNANDEZ** agreed to pay the head of the alien smuggling ring to smuggle Cuban baseball player D.S.L. from Cuba to Mexico.

3.      On or about April 10, 2009, **BARTOLO HERNANDEZ** signed a false and fraudulent "Consulting Agreement" between GSM, and N.M., the mother of the head of the alien smuggling ring.  In the false and fraudulent agreement, N.M. purported to be a "Consultant" who provided GSM with "services" consisting of referring baseball player D.S.L. "to sign a representation agreement" with GSM.  In exchange, GSM agreed to pay N.M. 5% "from the signing bonus/contract" of D.S.L.

4.      On or about July 22, 2009, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of D.S.L. in order to permit D.S.L. to sign a contract with a Major League Baseball team.

### Cuban Baseball Player Y.M.M.

5.      In or around September 2009, **BARTOLO HERNANDEZ** agreed to pay A.R. after A.R. smuggled Cuban baseball player Y.M.M. out of Cuba.

6.      On or about April 22, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of Y.M.M. in order to permit Y.M.M. to sign a contract with a Major League Baseball team.

7.      On or about September 22, 2010, **BARTOLO HERNANDEZ** directed A.R. to generate a false and fictitious invoice in which A.R. claimed to have provided $715,000 worth of baseball coaching services to Y.M.M.

8.      On or about September 11, 2012, **BARTOLO HERNANDEZ** caused Y.M.M. to wire approximately $75,000 into Citibank account, ending in 5091, that was controlled by **HERNANDEZ** on behalf of GSM.

9.      On or about October 22, 2013, **BARTOLO HERNANDEZ** caused Y.M.M. to wire approximately $125,000 into Citibank account, ending in 5091, that was controlled by **HERNANDEZ** on behalf of GSM.

<u>Cuban Baseball Player S.F.E.G.</u>

10.      On or about August 14, 2009, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of S.F.E.G. in order to permit S.F.E.G. to sign a contract with a Major League Baseball team.   In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of S.F.E.G. as an assistant manager of "Papa Pepe's."

11.      On or about April 21, 2010, **BARTOLO HERNANDEZ** submitted a visa application to the United States Department of State on behalf of S.F.E.G.   In that visa application, **HERNANDEZ** stated that S.F.E.G. had signed a contract to play professional baseball with a Major League Baseball team.

8

12.    On or about July 30, 2010, **BARTOLO HERNANDEZ** caused S.F.E.G. to wire approximately $6,075 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

### Cuban Baseball Player R.R.M.

13.    On or November 10, 2009, **JULIO ESTRADA** emailed **BARTOLO HERNANDEZ** a copy of a Mexican document purportedly belonging to R.R.M. which falsely and fraudulently listed the employment of R.R.M. as a welder.

14.    On or about January 20, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of R.R.M. in order to permit R.R.M. to sign a contract with a Major League Baseball team. In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of R.R.M. as a welder.

15.    On or about April 21, 2010, **BARTOLO HERNANDEZ** submitted a visa application to the United States Department of State on behalf of R.R.M.   In that visa application, **HERNANDEZ** stated that R.R.M. had signed a contract to play professional baseball with a Major League Baseball team.

16.    On or about July 19, 2010, **BARTOLO HERNANDEZ** caused R.R.M. to wire approximately $10,625 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

17.    On or about January 24, 2011, **BARTOLO HERNANDEZ** caused R.R.M. to wire approximately $10,600 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

### Cuban Baseball Player J.A.P.B.

18.     On or about November 13, 2009, **JULIO ESTRADA** emailed **BARTOLO HERNANDEZ** a copy of a Mexican document purportedly belonging to J.A.P.B. which falsely and fraudulently listed the employment of J.A.P.B. as as an independent body shop worker.

19.     On or about January 20, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of J.A.P.B. in order to permit J.A.P.B. to sign a contract with a Major League Baseball team.   In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of J.A.P.B. as an independent body shop worker.

20.     On or about April 21, 2010, **BARTOLO HERNANDEZ** submitted a visa application to the United States Department of State on behalf of J.A.P.B.   In that visa application, **HERNANDEZ** stated that J.A.P.B. had signed a contract to play professional baseball with a Major League Baseball team.

21.     On or about August 13, 2010, **BARTOLO HERNANDEZ** caused J.A.P.B. to wire approximately $17,500 into **HERNANDEZ**'s personal Citibank account, ending in 5701.

### Cuban Baseball Player C.D.J.L.A.

22.     On or about November 10, 2009, **JULIO ESTRADA** emailed **BARTOLO HERNANDEZ** a copy of a Mexican document purportedly belonging to C.D.J.L.A. which falsely and fraudulently listed the employment of C.D.J.L.A. as an area supervisor for "Wet Set Ski."

23.     On or about February 22, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of C.D.J.L.A. in order to permit

C.D.J.L.A. to sign a contract with a Major League Baseball team. In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of C.D.J.L.A. as an area supervisor for "Wet Set Ski."

24.     On or about April 8, 2011, **BARTOLO HERNANDEZ** caused C.D.J.L.A. to wire approximately $30,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

25.     On or about August 2, 2011, **JULIO ESTRADA** caused C.D.J.L.A. to wire approximately $24,200 into **ESTRADA**'s personal Bank of America account, ending 2309.

26.     On or about November 8, 2011, **JULIO ESTRADA** caused C.D.J.L.A. to wire approximately $3,450 into **ESTRADA**'s personal Bank of America account, ending 2309.

<u>Cuban Baseball Player R.O.A.</u>

27.     On or about November 10, 2009, **JULIO ESTRADA** emailed **BARTOLO HERNANDEZ** a copy of a Mexican document purportedly belonging to R.O.A. which falsely and fraudulently listed the employment of R.O.A. as an independent mechanic.

28.     On or about January 11, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of R.O.A. in order to permit R.O.A. to sign a contract with a Major League Baseball team. In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of R.O.A. as an independent mechanic.

Cuban Baseball Player A.H.B.

29.     On or about November 10, 2009, **JULIO ESTRADA** emailed **BARTOLO HERNANDEZ** a copy of a Mexican document purportedly belonging to A.H.B. which falsely and fraudulently listed the employment of A.H.B. as an area supervisor.

30.     On or about January 20, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of A.H.B. in order to permit A.H.B. to sign a contract with a Major League Baseball team.  In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of A.H.B as an area supervisor.

31.     On or about March 30, 2010, **JULIO ESTRADA** submitted and caused the submission of a visa application to the United States Department of State on behalf of A.H.B. In that visa application, **ESTRADA** stated that A.H.B. would be employed by a Major League Baseball team.

32.     On or about June 14, 2010, **BARTOLO HERNANDEZ** caused A.H.B. to wire approximately $200,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

33.     On or about June 18, 2010, **JULIO ESTRADA** caused a company controlled by Eliezer Lazo to wire approximately $202,703 into **ESTRADA**'s personal Bank of America account, ending 2309.

34.     On or about May 27, 2011, **BARTOLO HERNANDEZ** caused A.H.B. to wire approximately $50,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

12

35.     On or about August 30, 2011, **BARTOLO HERNANDEZ** caused A.H.B. to wire approximately $10,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

36.     On or about May 31, 2012, **BARTOLO HERNANDEZ** caused A.H.B. to wire approximately $87,500 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

37.     On or about August 12, 2013, **BARTOLO HERNANDEZ** caused A.H.B. to wire approximately $87,500 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

38.     On or about November 4, 2013, **JULIO ESTRADA** caused A.H.B. to wire approximately $100,000 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

<u>Cuban Baseball Player J.C.L.I.</u>

39.     On or about January 20, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of J.C.L.I. in order to permit J.C.L.I. to sign a contract with a Major League Baseball team.  In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of J.C.L.I. as a sales supervisor.

40.     On or about July 21, 2010, **JULIO ESTRADA** submitted a visa application to the United States Department of State on behalf of J.C.L.I.   In that visa application, **ESTRADA** stated that J.C.L.I. signed a contract to play baseball for a Major League Baseball team.

41.     On or about September 21, 2010, **BARTOLO HERNANDEZ** caused J.C.L.I. to deposit approximately $18,750 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

42.     On or about March 1, 2011, **BARTOLO HERNANDEZ** caused J.C.L.I. to deposit approximately $18,750 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

### Cuban Baseball Player F.F.R.

43.     On or about February 5, 2010, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of F.F.R. in order to permit F.F.R. to sign a contract with a Major League Baseball team.   In that application, **HERNANDEZ** submitted and caused the submission of a Mexican document that falsely and fraudulently listed the employment of F.F.R. as a sales department manager.

44.     On or about January 14, 2011, **JULIO ESTRADA** submitted and caused the submission of a visa application to the United States Department of State on behalf of F.F.R.   In that visa application, **ESTRADA** stated that F.F.R. would be employed by a Major League Baseball team.

### Cuban Baseball Player L.M.T.

45.     On or about February 14, 2011, **BARTOLO HERNANDEZ** sent an email to Major League Baseball on behalf of L.M.T.   In that email, **HERNANDEZ** stated that L.M.T. was a resident of Mexico.

14

46.     On or about April 3, 2011, **BARTOLO HERNANDEZ** directed Eliezer Lazo to bring L.M.T. across the United States border knowing that L.M.T. lacked a passport and a visa to enter the United States lawfully.

47.     On or about April 4, 2011, **BARTOLO HERNANDEZ** caused Eliezer Lazo and Joel Martinez Hernandez to bring L.M.T. across the United States border knowing that L.M.T. lacked a passport and a visa to enter the United States lawfully.

48.     On or about August 25, 2011, **BARTOLO HERNANDEZ** caused L.M.T. to wire approximately $225,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

<u>Cuban Baseball Players A.R.L. #1 and A.R.L. #2</u>

49.     In or around January 2012, **BARTOLO HERNANDEZ** met with Eliezer Lazo and A.R. in Miami-Dade County, in the Southern District of Florida, and agreed to pay A.R. to smuggle Cuban baseball players A.R.L. #1 and A.R.L. #2 from Cuba to the Dominican Republic.

50.     On or about January 25, 2012, **BARTOLO HERNANDEZ** sent an email to Major League Baseball containing a visa purportedly issued by the Dominican Republic to A.R.L. #1.

51.     On or about May 17, 2012, **BARTOLO HERNANDEZ** sent an email to Major League Baseball containing Haitian visas purportedly issued by the Republic of Haiti to A.R.L. #1 and A.R.L. #2.

52.     On or about May 27, 2012, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of A.R.L. #2 in order to permit A.R.L. #2 to sign a contract with a Major League Baseball team.

53.     On or about June 4, 2012, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of A.R.L. #1 in order to permit A.R.L. #1 to sign a contract with a Major League Baseball team.

### Cuban Baseball Player H.A.U.R.

54.     On or about January 25, 2012, **BARTOLO HERNANDEZ** sent an email to Major League Baseball containing a visa purportedly issued by the Dominican Republic to H.A.U.R.

55.     On or about June 4, 2012, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of H.A.U.R. in order to permit H.A.U.R. to sign a contract with a Major League Baseball team.

56.     On or about May 20, 2013, **JULIO ESTRADA** caused H.A.U.R. to deposit approximately $27,247 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

### Cuban Baseball Player O.D.L.R.

57.     On or about June 4, 2012, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of O.D.L.R. in order to permit O.D.L.R. to sign a contract with a Major League Baseball team.

58.     In or around February 2013, **JULIO ESTRADA** directed Diana Tilbert to bring O.D.L.R. across the United States border knowing that O.D.L.R. lacked a passport and a visa to enter the United States lawfully.

59.      On or about February 17, 2013, **JULIO ESTRADA** caused O.D.L.R. to be brought across the United States border knowing that O.D.L.R. lacked a passport and a visa to enter the United States lawfully.

60.      On or about February 22, 2013, **JULIO ESTRADA** caused O.D.L.R. to deposit approximately $191,846 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

61.      On or about June 16, 2015, **JULIO ESTRADA** caused O.D.L.R. to wire approximately $95,000 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

### Cuban Baseball Player D.H.H. and His Girlfriend Y.D.R.

62.      In or around February 2013, **AMIN LATOUFF** paid $60,000 to a boat captain for smuggling Cuban baseball player D.H.H. from Cuba to the Republic of Haiti.

63.      On or about May 15, 2013, **BARTOLO HERNANDEZ** sent an email to Major League Baseball containing a visa purportedly issued by the Republic of Haiti to D.H.H.

64.      On or about June 21, 2013, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of D.H.H. in order to permit D.H.H. to sign a contract with a Major League Baseball team.

65.      On or about June 30, 2013, **JULIO ESTRADA** and **AMIN LATOUFF** provided Y.D.R. a fraudulent passport and visa in a false name for Y.D.R. to use to board a flight from Port-au-Prince, in the Republic of Haiti, to Miami International Airport, in Miami-Dade County, in the Southern District of Florida.

66.     In our around August 2013, **BARTOLO HERNANDEZ** informed D.H.H. that he needed to arrive in the United States very quickly to keep an offer to play for a United States baseball team.

67.     On or about August 16, 2013, **JULIO ESTRADA** and **AMIN LATOUFF** provided D.H.H. a fraudulent passport and visa in a false name for D.H.H. to use to board a flight from Port-au-Prince, in the Republic of Haiti, to Miami International Airport, in Miami-Dade County, in the Southern District of Florida.

68.     On or about August 16, 2013, **AMIN LATOUFF** directed D.H.H. to board a flight from Port-au-Prince, Haiti, to Miami International Airport, in Miami-Dade County, in the Southern District of Florida, knowing that D.H.H. did not have a valid visa to enter the United States lawfully.

69.     On or about August 16, 2013, **AMIN LATOUFF** coached D.H.H. to offer a false account to United States immigration officials about the manner in which D.H.H. arrived at Miami International Airport in the Southern District of Florida.

70.     On or about December 20, 2013, **JULIO ESTRADA** caused D.H.H. to deposit approximately $340,000 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

71.     On or about January 28, 2014, **JULIO ESTRADA** caused D.H.H. to deposit approximately $530,638 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

<u>Cuban Baseball Player J.A.C. and His Girlfriend Y.H.H.</u>

72.     In or around August 2013, **AMIN LATOUFF** paid $160,000 to a boat captain as

18

payment for smuggling Cuban baseball player J.A.C. from Cuba to the Republic of Haiti.

73.     On or about August 29, 2013, **BARTOLO HERNANDEZ** submitted and caused the submission of an application to OFAC on behalf of J.A.C. in order to permit J.A.C. to sign a contract with a Major League Baseball team.

74.     On or about August 29, 2013, **BARTOLO HERANDEZ** sent an email to Major League Baseball containing a visa purportedly issued by the Republic of Haiti to J.A.C.

75.     On or about October 13, 2013, **AMIN LATOUFF** provided J.A.C. a fraudulent passport and visa in a false name for J.A.C. to use to board a flight from Port-au-Prince, in the Republic of Haiti, to Miami International Airport, in Miami-Dade County, in the Southern District of Florida.

76.     On or about October 17, 2013, **AMIN LATOUFF** provided Y.H.H. a false and fraudulent passport and United States visa for Y.H.H. to use to board a flight from Port-au-Prince, in the Republic of Haiti, to Miami International Airport, in Miami-Dade County, in the Southern District of Florida.

77.     On or about March 11, 2014, **JULIO ESTRADA** caused J.A.C. to wire approximately $2,448,000 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

78.     On or about March 26, 2014, **BARTOLO HERNANDEZ** received approximately $276,250 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

19

79.     On or about August 20, 2014, **JULIO ESTRADA** caused J.A.C. to wire approximately $2,000,000 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management

80.     On or about October 21, 2014, **BARTOLO HERNANDEZ** received approximately $217,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

81.     On or about December 10, 2014, **JULIO ESTRADA** caused J.A.C. to wire approximately $1,360,000 into TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

82.     On or about December 23, 2014, **BARTOLO HERNANDEZ** received approximately $100,000 into Citibank account, ending in 5091, that **HERNANDEZ** controlled on behalf of GSM.

<u>False and Fraudulent Statements to Federal Agencies</u>

83.     On or about November 30, 2012, **JULIO ESTRADA** wire transferred approximately $150,000 to Diana Tilbert from the TD Bank account, ending in 8934, that **ESTRADA** controlled on behalf of Total Baseball Management.

84.     In or around September 2013, **JULIO ESTRADA** coached Diana Tilbert to falsely and fraudulently state to United States law enforcement that (a) Tilbert did not know Eliezer Lazo and (b) Tilbert was unaware how Cuban athletes and migrants obtained Mexican residency documents.

85.     On or about January 21, 2014, in Miami-Dade County, in the Southern District of Florida, Tilbert followed the directions of **JULIO ESTRADA** and falsely and fraudulently told

federal law enforcement agents that she was unaware how Cuban athletes and migrants obtained Mexican residency documents that contained false and fraudulent employment information.

86.    On or about December 4, 2013, in Broward County, in the Southern District of Florida, **BARTOLO HERNANDEZ** provided false and fraudulent statements and representations to federal law enforcement agents in that **HERNANDEZ** stated that he did not have first-hand knowledge about how Cuban baseball players were smuggled out of Cuba.

87.    In or around September 2014, **JULIO ESTRADA** travelled to Providence, Rhode Island to meet with D.H.H.

88.    In or around September 2014, **JULIO ESTRADA** directed D.H.H. to falsely and fraudulently state to federal law enforcement that D.H.H. left Cuba with unknown fishermen, when in truth and in fact as **ESTRADA** and D.H.H. then knew, D.H.H. was smuggled out of Cuba by a human smuggling ring and not by unknown fishermen.

All in violation of Title 18, United States Code, Section 371.

**COUNTS 2-7**
**Bringing an Alien into the United States**
**(8 U.S.C. § 1324(a)(2)(B)(ii))**

On or about the date specified below as to each Count, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, as specified below as to each Count, did knowingly bring, and attempt to bring, an alien, as specified below as to each Count, to the United States for the purpose of commercial advantage and private financial gain, knowing and in reckless disregard of the fact that such alien had not received prior official authorization to come to, enter, and reside in the United States, regardless of any official action which might later be taken with respect to such alien:

| COUNT | APPROXIMATE DATE | DEFENDANT(S) | ALIEN |
|-------|------------------|--------------|-------|
| 2 | April 4, 2011 | **BARTOLO HERNANDEZ** | L.M.T. |
| 3 | February 17, 2013 | **JULIO ESTRADA** | O.D.L.R. |
| 4 | June 30, 2013 | **JULIO ESTRADA and AMIN LATOUFF** | Y.D.R. |
| 5 | August 16, 2013 | **BARTOLO HERNANDEZ, JULIO ESTRADA, and AMIN LATOUFF** | D.H.H. |
| 6 | October 13, 2013 | **BARTOLO HERNANDEZ, JULIO ESTRADA, and AMIN LATOUFF** | J.A.C. |
| 7 | October 17, 2013 | **AMIN LATOUFF** | Y.H.H. |

In violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii) and Title 18, United States Code, Section 2.

## FORFEITURE
### (18 U.S.C. § 982(a)(6))

1.     The allegations in Counts 1 through 7 of this Superseding Indictment are realleged and fully incorporated herein by reference for the purpose of alleging forfeiture to the United States of America of certain property in which any of the defendants have an interest.

2.     Upon conviction of any violation of Title 8, United States Code, Section 1324, as alleged in Counts 1 through 7 of this Superseding Indictment, defendants **BARTOLO**

22

**HERNANDEZ**, **JULIO ESTRADA**, and **AMIN LATOUFF** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(6), (a) any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted; and (b) any property real or personal that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted or that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.

3.      The assets subject to forfeiture include, but are not limited to, the following:

**Interest in Certain Contracts or Matters**

(a)     all interests the defendants have, directly or indirectly, in any contracts with "L.M.T.," including but not limited to future payments purportedly owed pursuant to said contract(s);

(b)     all interests the defendants have, directly or indirectly, in any Major League Baseball contracts with "D.H.H.," including but not limited to future payments purportedly owed pursuant to said contract(s)

(c)     all interests the defendants have, directly or indirectly, in any Major League Baseball contracts with "J.A.C.," including but not limited to future payments purportedly owed pursuant to said contract(s);

(d)     all interests the defendants have, directly or indirectly, in any Major League Baseball contracts with "O.D.L.R.," including but not limited to future payments purportedly owed pursuant to said contract(s);

(e)     all interests the defendants have in any Major League Baseball Player Association arbitration proceeding, including but not limited to the arbitration proceeding captioned *In the Matter of the Arbitration between Global Sports Management Inc., and Praver Shapiro Sports Management, LLC, Claimants; & Leonys Martin, Respondent*;

**Real Property**

(f)     real property located at 1536 SE 15 Court, #203, Deerfield, Florida 33441, and includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

23

(g)     real property located 721 Tanglewood, Circle, Weston, Florida 33327, and includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

(h)     real property located at 1102 SW 149th Path, Miami, Florida 33194, and includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

(i)     real property located 3842 SW 153rd Place, Miami, Florida, and includes all buildings, improvements, fixtures, attachments and easements found therein or thereon;

**Bank Account**

(j)     approximately $555,101.19 seized from TD Bank Account 4269548934 in the name of Total Baseball Representation and Training Inc.;

**Vehicles**

(k)     one 2009 Mercedes Benz C Class, VIN: WDDGF54X39R052979, Florida License Plate DFY8G;

(l)     one 2014 Mercedes Benz E Class, VIN: WDDHF0EBXEA938834, Florida License Plate CNWB24;

(m)     one 2013 Mercedes Benz GL Class, VIN:  4JGDF2EE8DA169050, Florida License Plate BPVR93; and

(n)     one 2012 Mercedes Benz GL Class, VIN:  4JGBF2FE9CA781486, Florida License Plate DBQK74.

**Money Judgment**

(o)     a forfeiture money judgment in the amount of $1,575,000, which represents the value of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the violation alleged in Count Two of this Superseding Indictment; and

(p)     a forfeiture money judgment in the amount of $14,000,000, which represents the value of any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds traceable to the commission of the violation alleged in Counts One, Three and Five through Nine of this Superseding Indictment.

5.      If the property described above as being subject to forfeiture, as a result of any act

or omission of defendants, **BARTOLO HERNANDEZ, JULIO ESTRADA** or **AMIN**

**LATOUFF**

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to or deposited with a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

made applicable through Title 18, United States Code, Section 982(b)(1) to seek forfeiture of any

other property of the defendant, up to the value of the above forfeitable property, including but

not limited to:

(i)      one 2001 Honda motorcycle, VIN # JH2RC44691K503432; and

(ii)     all interests the defendants have, directly or indirectly, in any contracts with any
baseball players.

All pursuant to Title 18, United States Code, Section 982(a)(6) and the procedures set forth at Title 21, United States Code, Section 853.

A TRUE BILL

_____
FOREPERSON

_____
WIFREDO A. FERRAR
UNITED STATES ATTORNEY

_____
H. RON DAVIDSON
ASSISTANT UNITED STATES ATTORNEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA                    CASE NO. 16-20091-CR-WILLIAMS(s)_____

vs.

**CERTIFICATE OF TRIAL ATTORNEY\***

**BARTOLO HERNANDEZ, JULIO ESTRADA,**
**and AMIN LATOUFF**

_____Defendants.
_____/    **Superseding Case Information:**

| Court Division: (Select One) | | | New Defendant(s) | Yes | X | No | ____ |
|---|---|---|---|---|---|---|---|
| | | | Number of New Defendants | | 2 | | |
| X | Miami | ____ Key West | Total number of counts | | 7 | | |
| ____ | FTL | ____ WPB | ____ FTP | | | | |

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:      (Yes or No)          Yes
    List language and/or dialect        Spanish_____

4.  This case will take 6-10 days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                            (Check only one)

    | i | 0 to 5 days | | Petty | |
    |---|---|---|---|---|
    | II | 6 to 10 days | x | Minor | |
    | II | 11 to 20 days | | Misdem. | |
    | IV | 21 to 60 days | | Felony | x |
    | V: | 61 days and over | | | |

6.  Has this case been previously filed in this District Court?    (Yes or No)          Yes
    If yes:
    Judge:                                        Case No.          16-20091-CR-WILLIAMS
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?    (Yes or No)          No
    If yes:
    Magistrate Case No.                          _____
    Related Miscellaneous numbers:               _____
    Defendant(s) in federal custody as of        _____
    Defendant(s) in state custody as of          _____
    Rule 20 from the _____         District of _____

    Is this a potential death penalty case? (Yes or No)          No

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?        _____ Yes    X    No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?        _____ Yes    X    No

_____
H. RON DAVIDSON
ASSISTANT UNITED STATES ATTORNEY
Court No. A5501144

\*Penalty Sheet(s) attached                                                REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: <u>BARTOLO HERNANDEZ</u>**

**Case No:** <u>16-20091-CR-WILLIAMS(s)</u>

Count #: 1

  Conspiracy to Commit an Offense Against the United States

  Title 18, United States Code, Section 371

**\* Max.Penalty**:   5 Years' Imprisonment

Counts #: 2,5,6

  Bringing an Alien into the United States

  Title 8, United States Code, Section 1324(a)(2)(B)(ii)

**\* <u>Max.Penalty</u>**: 10 years' imprisonment (minimum 3 years' imprisonment) as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name**: <u>**JULIO ESTRADA**</u>

**Case No**: <u>16-20091-CR-WILLIAMS(s)</u>

Count #: 1

  <u>Conspiracy to Commit an Offense Against the United States</u>

  <u>Title 18, United States Code, Section 371</u>

**\* Max.Penalty**:  <u>5 years' imprisonment</u>

Counts #: 3-6

  <u>Bringing an Alien into the United States</u>

  <u>Title 8, United States Code, Section 1324(a)(2)(B)(ii)</u>

**\* Max.Penalty**: <u>10 years' imprisonment (minimum 3 years' imprisonment) as to each count</u>

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name: AMIN LATOUFF**

**Case No**: 16-20091-CR-WILLIAMS(s)

Count #: 1

Conspiracy to Commit an Offense Against the United States

Title 18, United States Code, Section 371

**\* Max.Penalty**:   5 years' imprisonment

Counts #: 4-7

Bringing an Alien into the United States

Title 8, United States Code, Section 1324(a)(2)(B)(ii)

**\* Max.Penalty**: 10 years' imprisonment (minimum 3 years' imprisonment) as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**